# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES DILLARD, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No.: RDB-18-94 |
| MAHBOOB ASHRAF, *et al.*, | : | |
| | : | |
| Defendants. | | |

. . . . . . . . . .o0o. . . . . . . . . .

## MEMORANDUM OPINION

The above-captioned civil rights action was filed by self-represented Plaintiff James Dillard on January 10, 2018. Dillard, an inmate currently confined at Western Correctional Institution ("WCI"), initiated this action asserting civil rights violations by Medical Defendants Mahboob Ashraf, M.D. ("Dr. Ashraf"), Brenda Reese, R.N. ("Nurse Reese"), Dennis Martin, R.N. ("Nurse Martin"), and Peggy Mahler,[1] PA/NP ("Nurse Practitioner Mahler"), of the WCI medical department (collectively "Defendants"). ECF No. 1, p. 1.[2] Dillard alleges that he was deprived by Defendants of his diabetes medication and pain medications as a form of punishment, amounting to an Eighth Amendment violation. *Id*.

Now pending before the Court is Defendants' Motion to Dismiss or, Alternatively, Motion for Summary Judgment filed on April 10, 2018. ECF No. 9. Dillard was advised of his right to file a response, ECF No. 10, and he filed a Motion to Oppose Defendants' motion on June 6, 2018. ECF No. 14. Defendants filed a Reply to Plaintiff's Opposition on June 20, 2018.

---

[1] The Clerk shall correct the docket to reflect the full and accurate spelling of Defendants' names.

[2] This opinion cites to pagination assigned by the Court's electronic docketing system.

ECF No. 15.  For the reasons stated below, the dispositive motion is construed as a motion for summary judgment[3] and IS DENIED without prejudice.

## Background

### A.  Plaintiff's Allegations

Dillard alleges that he has diabetes, neuropathy, and plantar fasciitis,[4] as well as a previous spinal injury, broken arm, and dislocated shoulder.  ECF No. 1, pp. 3-4.  As a result of his illnesses and injuries, Dillard has undergone multiple surgeries on his feet and arm, has screws and a deformity in his arm, walks with a cane, and required previous hospitalization which included a six-day, medically-induced coma.  *Id*.  According to Dillard, he has been declared permanently partially disabled, *id*., p. 4, and has taken pain medication for over five years, *id*., p. 5.

Dillard alleges that on September 29, 2017, a corrections officer conducted a search of Dillard's cell and confiscated his seizure medication, Primidone, along with his diabetes medication, Metformin.  ECF No. 1, p. 3.  He claims that he was charged with "hoarding unauthorized medication" and "intent to sell," and placed on disciplinary segregation.  *Id*.  Dillard further claims that, on the same date, Nurse Reese called Dr. Ashraf to inform him that Dillard had been caught hoarding medications, and that in turn Dr. Ashraf ordered Nurse Reese

---

[3] Defendants' dispositive motion is treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered.  *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[4] Plantar fasciitis is a common cause of heel pain.  It involves inflammation of a thick band of tissue running across the bottom of the foot and connecting the heel to the toes.  *See* https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/symptoms-causes/syc-20354846 (last visited July 20, 2018).

to discontinue three of Dillard's medications: Primidone, for seizures; Gabapentin (Neurontin)[5], for nerve pain and neuropathy; and Tramadol, for pain caused by previous injury. *Id*.

Dillard's cellmate Rodney McNeil, by affidavit, states: "On 9-29-17 . . . I observed [the o]fficer . . . confiscate all of the plaintiffs [sic] medications, including eye drops and ointments." ECF No. 14-1, p. 1. A September 29, 2017 medical "Administrative Note" indicates that Dillard was "hoarding medication," and that a corrections officer found "watch take" medications in his cell, including 21 Primidone (Mysoline)[6] pills, Ultram (Tramadol)[7], and Neurontin, all of which were discontinued at that time per Dr. Ashraf's orders. ECF No. 9-2, p. 7.

Dillard claims that he did not hoard or sell any medication, and that the Primidone pills were given to him at one time in a "blister pack" of 30 pills. ECF No. 14-1, p. 2. His cellmate's affidavit states that, "[w]hile housed with the plaintiff, [McNeil] never observed him hoard pills or sell pills to other inmates." *Id*., p. 1. On October 8, 2017, Dillard alleges he attended an adjustment hearing where he was "cleared" of "hoarding" and "distribution of medication," there was a "finding of no wrongdoing," and he was released from disciplinary segregation. ECF No. 1, p. 4. An October 6, 2017 "Inmate Hearing Record," indicates that Dillard was charged with violations of rules 111, 112, and 114, to which he pleaded not guilty, and that the Hearing

---

[5] Gabapentin is the generic name for the medication Neurontin, which is named on Dillard's medication list. ECF No. 9-2, p. 7; *see* https://www.drugs.com/availability/generic-neurontin.html (last visited Aug. 6, 2018).

[6] Primidone is the generic name for the medication Mysoline, which is the named on Dillard's medication list. ECF No. 9-2, p. 7; s*ee* https://www.drugs.com/availability/generic-mysoline.html (last visited Aug. 6, 2018).

[7] Ultram is a common brand name for the medication Tramadol, which is named on Dillard's medication list. ECF No. 9-2, p. 7; *see* https://www.drugs.com/availability/generic-ultram.html (last visited Aug. 6, 2018).

Officer dismissed each, as "[u]pon preliminary review . . . [the] Institution request[ed] dismissal due to the fact that the rules charged were not supported." ECF No. 14-4.

Dillard claims that he was forced to go without his diabetes medication for 33 days, during which his blood sugar rose from an average of 100 milligrams per deciliter to 250, and reached as high as 409. ECF No. 1, p. 5. As a result, he suffered severe headaches and periods of blindness. *Id*., p. 5. Dillard also claims that his pain medications were never reordered and he now lives in a "state of constant debilitating pain." *Id*. He further alleges that he suffered from eight days of withdrawal, including severe cramps, pain, chills, cold sweats, and discomfort, from September 30, 2017 to October 7, 2017, because pain medications he had taken for five years were abruptly stopped. *Id*.; ECF No. 14, p. 3.

According to Dillard, medical staff have been "well aware of the severity of [his] medical conditions and resulting pain." ECF No. 1, p. 5. After his medications were seized, Dillard states that he filed multiple sick call requests and complaints, "to no avail." ECF No. 1, p. 4. He filed "Sick Call Request/Encounter" forms on October 1, 16, 21, and 22, 2017, writing that he was in pain and without his "chronic care" medications. ECF No. 14-2, pp. 1-4.

On October 7, 2017, Dillard was seen by Nurse Martin, ECF No. 1, p. 4; ECF No. 9-2, p. 10, whom he claims did not treat him, reorder his diabetes medications, or refer him to a higher level provider for treatment, ECF No. 1, p. 4.

On the October 16 sick call request form, Dillard indicated that he had not received his diabetes medication for 18 days. ECF No. 14-2, p. 2. He wrote again on the October 21 form that he had been without the medication for 23 days. *Id*., p. 3.

An October 18, 2017 medical visit record indicates that Dillard was seen by Nurse Tammy Buser, to whom he complained, "I want my medications." ECF No. 14-2, p. 5. The

visit record further provides: "The patient was found to be hoarding medications and his pain medications were taken. He fought the ticket and states that he won. He is still not receiving his regular medications. I [am] putting him in with a provider to get this straightened out." *Id*.

On October 24, 2017, Dillard was seen by Nurse Practitioner Mahler, ECF No. 1, p. 4; ECF No. 9-2, p. 12, whom he claims "failed to reorder [his] diabetic medication despite [his] complaints and requests," ECF No. 1, p. 4. The October 24 visit record provides: "[Dillard] stated custody took his CC meds on 9/29/17 . . . [and] now he has not had any meds for 24 days for his LBP that radiates down his legs to his feet, . . . burning pain, right shoulder pain with movement . . . [and] b/l feet pain from plantar [fasciitis]." ECF No. 9-2, p. 12.

Another visit record by Nurse Practitioner Mahler from November 27, 2017, provides:

> [Dillard] is very argumentative [and] upset he [is] being tapered off of neurontin [and] tramadol [and] is requesting to see a doctor. Neurontin [and] tramadol were d/c on 9/29/17 due to hoarding per EPHR alert. He stated he was not hoarding [and] ultram or Neurontin was never found on him. He called me a liar. He was advised I could not resume those meds. He was advised to refrain from heavy lifting . . . to do back stretching, start Cymbalta.

ECF No. 9-2, p. 19. Dillard claims that each time he has requested to have his pain medications reordered, the medical staff have said that he cannot have them because he hoarded medication on September 29, 2017, "disregarding the fact that he was cleared of any wrongdoing." ECF No. 1, p. 5.

Dillard alleges that he also filed an administrative grievance about these issues, received no response, and then filed an appeal. *Id*., p. 2. He filed "Request for Administrative Remedy" forms on October 1, 6, 22, November 1, and December 29, 2017, marking each as an "Emergency Request," and writing of the officer's taking his medications, his pain and withdrawal, his temporary blindness and headache, his high blood sugar, his desire for the doctor who stopped his medications to be removed from his treatment, the failure of Nurses Martin and

Reese and Nurse Practitioner Mahler to help him, and his request for his medications to be returned. ECF No. 14-3, pp. 1-6, 12-15. The October 22, 2017 form includes a "Part C – Receipt" that states "Resubmit" and provides several questions regarding details of the issues. *Id*., p. 12.

A December 4, 2017 letter addressed to Dillard acknowledges receipt of his submission and advises of his right to appeal any response received within the applicable timeframes. ECF No. 14-3, p. 7. The exhibit also includes an "Appeal of Administrative Remedy Response" form filed by Dillard on October 24, 2017, and another filed on January 4, 2018, on which he indicated that he had received "No Response from the Warden," who "ha[d] had 2 chances to fix this matter," asking that the Commissioner's office "award [him] everything he ask[ed] for in [his] ARP and appeal." *Id*., pp. 8, 10-11.

Finally, a January 16, 2018 letter addressed to Dillard acknowledges receipt of his request and states, "We are unable to process the issue(s) because we are unable to determine your intent," and advises, "If attempting to appeal the warden's decision you must allow the appropriate timeframe in accordance with Executive Directive: OPS.185.0002K(6)." *Id*., p. 9.

Dillard alleges that Defendants' continuous denial of "treatment by way of pain management," as well as failure to provide him with his diabetes medication for 33 days, demonstrates deliberate indifference to his serious medical needs, falls below a community standard of care, and violates contractual obligations and physician ethics. ECF No. 1, p. 5. He seeks an order requiring his pain medications be returned to him and $100,000 in compensatory and punitive damages. *Id*., p. 6.

### B. Defendants' Assertions

Defendants assert that they are entitled to qualified immunity because they are "[p]rivate parties compelled by the government to undertake duties that would otherwise have to be performed by a public official," and their actions do not violated clearly established statutory or constitutional rights. ECF No. 9-1, pp. 15-16.

Alternatively, Defendants claim that Dillard received reasonable and appropriate medical care at all times. ECF No. 9-1, p. 2. They reiterate that Dillard was caught hoarding unauthorized medications, including "watch-take" medications, which they allege are required to be ingested by an inmate in the direct sight of a health care provider to ensure that they are not hoarded or otherwise abused. ECF No. 9-1, p. 2; ECF No. 9-2. Defendants allege that neither they nor "the WCI medical department was not notified at any time by security or other WCI department" that Dillard was "cleared" of hoarding the discontinued pain medications. ECF No. 9-1, p. 2. Accordingly, they claim that there are no medical records or other evidence to establish that Defendants were aware of any decision or finding that Dillard was not being disciplined for hoarding medications. *Id*. Furthermore, Defendants claim that the fact that correctional staff did not go forward with disciplinary actions does not negate that Dillard was found to be hoarding medications. ECF No. 9-1, p. 3. They argue that hoarding of medications means that an inmate did not ingest them when the medications were provided and demonstratethat such medications are not medically necessary. ECF No. 9-1, p. 3. Defendants claim, therefore, that the pain medications were properly discontinued for Dillard "regardless of whether any disciplinary action [was] pursued against [him]." ECF No. 9-1, p. 3.

Defendants further allege that Dillard was not denied treatment by way of pain management. ECF No. 9-1, p. 3. Defendants note that at the time certain pain medications were

7

discontinued, Dillard had standing orders for and continued to receive Baclofen, a muscle relaxant. ECF No. 9-1, p. 3. They also claim that Dillard could have bought additional pain medications if and when he needed them, as he had access to over-the-counter acetaminophen and ibuprofen at the commissary at all times. ECF No. 9-1, p. 3. Furthermore, according to Defendants, Dillard's medical providers discussed adding a variety of other pain medications for him on October 26, 2017, including Elavil, Tegratol, or Nortriptyline, all of which are medications prescribed for nerve pain; however, they claim that Dillard declined these medications. ECF No. 9-1, p. 3. Defendants allege that Dillard also was "not interested in Cymbalta," another medication frequently prescribed for nerve pain. ECF No. 9-1, p. 3. Ultimately, Defendants allege, Tylenol 500 and Excedrin Migraine were ordered for him, and Dillard was educated on back exercises and stretches that he could perform to help alleviate the pain. ECF No. 9-1, p. 3.

Additionally, Defendants allege that Dillard's providers never discontinued or failed to reorder his diabetes medication. ECF No. 9-1, p. 4. According to Defendants, Dillard had active orders for Metformin at all relevant times. ECF No. 9-1, p. 4. Defendants' several medical visit records, including those of September 29, October 1, 7, 26, November 9, 13, 27, December 24, 28, and 29, 2017, and January 5, February 4, 17, 22, 27, March 6, 21, and 22, 2018, all name Metformin as an active medication on Dillard's medication list. ECF No. 9-2, pp. 7, 9-10, 13, 15, 17, 21, 23, 25, 27, 29, 32, 35, 37, 39, 45, 50-51, 53. These records cover the times Dillard was seen by Nurse Martin on October 7, 2017, and by Nurse Practitioner Mahler on October 27, 2017. ECF No. 1, p. 4; ECF No. 9-2, pp. 10, 12. On both occasions, Defendants claim, Dillard did not make medical staff aware that he was unable to obtain his diabetes medication. ECF No. 9-1, pp. 4-5.

8

In response, Dillard does not dispute that he had an active order for diabetes medication at all times, but claims that this fact is irrelevant because the medication was confiscated and Defendants refused to reorder it despite his complaints, in order to punish him for allegedly hoarding medication. ECF No. 14, p. 2. Additionally, Dillard notes that Defendants did not provide him with any alternative for his discontinued pain medications until 26 days after the medications were taken, and that the alternatives they claim he had access to either were not for pain or were inadequate to treat his pain, as evidenced by the fact that he had been receiving prescription strength medication. ECF No. 14, p. 5. Finally, Dillard asserts that he never refused treatment. ECF No. 14-1, p. 2.

**Standard of Review**

This Court is mindful of its obligation to liberally construe the pleadings of pro se litigants. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, liberal construction does not mean that this Court can ignore a clear failure in the pleading to allege facts which set forth a cognizable claim, *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990), or "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). In making this determination, "[t]he district court . . . must hold the pro se complaint to less stringent standards than pleadings drafted by attorneys and must read the complaint liberally." *White v. White,* 886 F. 2d 721, 722-23 (4th Cir. 1989).

A motion for summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of

9

fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of, and construe the facts in the light most favorable to, the non-moving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998). Nevertheless, a party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Thus, on those issues on which the non-moving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *See Anderson*, 477 U.S. at 256.

**Analysis**

The Court first examines Defendants' claim raising qualified immunity as an affirmative defense. ECF No. 9-1, pp. 15-16. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant is not entitled to summary judgment on the basis of qualified

immunity, however, if (1) a genuine issue of material fact exists regarding whether the government official violated one of the plaintiff's federally protected rights, and (2) the right at issue was "clearly established" at the time of the events in question. *See id*. at 232.

Defendants are not government officials. Instead, they provide medical services to inmates through a contract between Wexford, their employer, and the Department of Public Safety and Correctional Services. Defendants rely on *Filarsky v. Delia*, 566 U.S. 377 (2012), by way of analogy in support. In *Filarsky*, the Supreme Court held that private individuals may assert qualified immunity when they are "retained by the [government] to assist [in a task for which] government employees performing such work are entitled to seek the protection of qualified immunity." 566 U.S. at 393-94. However, Defendants cite no authority to indicate that *Filarsky* has been extended to contractual medical care providers working in correctional facilities. Accordingly, the Court shall address the merits of this case.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment constitutional claim for denial of medical care, Dillard must demonstrate that Defendants' actions, or failures to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

To satisfy the subjective "deliberate indifference" component, the treatment rendered must, in essence, be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir.

1990). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier*, 896 F.2d at 851. Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U. S. 825, 837 (1994).

"[S]ociety does not expect that prisoners will have unqualified access to healthcare." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Hudson v. McMillian*, 503 U. S. 1, 9 (1992)). Therefore, to satisfy the objective "serious medical need" component, a prisoner's medical need must be "'life threatening or pose[ ] a risk of needless pain or lingering disability if not treated at once." *Anderson-El v. O'Keefe*, 897 F. Supp. 1093, 1096 (N.D. Ill. 1995) (quoting *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)). In determining whether a deprivation of medical care amounts to an Eighth Amendment violation, courts must consider the severity of the medical need, the potential for harm if medical care was denied or delayed, and whether such harm actually resulted from the treatment, or lack thereof, rendered. *See Burns v. Head Jailor of LaSalle Cty.*, 576 F. Supp. 618, 620 (D. N. Ill. 1984).

Dillard alleges that Defendants failed to provide him his diabetes medication, Metformin, for 33 days, resulting in high blood sugar, severe headaches, and periods of temporary blindness. Defendants respond by noting that Dillard had active orders for Metformin at all relevant times. Additionally, Defendants claim that Dillard did not, in person, make any complaints to medical staff about the issue, and, therefore, if he was not receiving the medication, they were unaware of this fact. However, Dillard's evidence shows that he submitted multiple sick call complaint forms during the relevant time period to medical staff, writing of his inability to obtain the medication. Furthermore, Defendants do not address if, when, how, or by whom Dillard was

actually administered the diabetes medication, nor do they provide any documentation of such, beyond simply noting that the medication was on his "active" list of medications.

In addition, Dillard alleges that Defendants discontinued his pain medications, Primidone, Neurontin, and Tramadol, when he was charged with hoarding medications, and that Defendants refused to reinstate the medications after he was cleared of the charges, resulting in withdrawal and constant debilitating pain for him. Defendants claim that they were not aware of Dillard's being cleared of the hoarding charges against him, and argue that the pain medications evidently were not medically necessary if Dillard had been hoarding them rather than ingesting them. However, Dillard's evidence shows that he alerted medical staff that he had contested the hoarding charges and prevailed at the hearing. Defendants do not address what, if any, actions were taken to investigate the status of those charges. Furthermore, Defendants do not address Dillard's claim that the reason he was charged with, and later cleared of, hoarding medications is that he was provided with a "blister pack" of 30 Primidone pills.

As Defendants have failed to provide certain relevant evidence, as detailed above, Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment is DENIED without prejudice, subject to renewal upon submission of the necessary information.

\_\_\_August 10, 2018\_\_\_  _____/s/_____
Date           RICHARD D. BENNETT
               UNITED STATES DISTRICT JUDGE